THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR MADDEN *et al.*, Defendants-Appellants.

First District (1st Division)   No. 62196

Opinion filed August 22, 1977.—Rehearing denied October 3, 1977.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins, Assistant Public Defender, of counsel), for appellant Arthur Madden.

Howard T. Savage and Patricia Unsinn, both of Chicago, for appellant Michael Reilly.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

In a single indictment, Arthur Madden was charged with rape and contributing to the sexual delinquency of a child and Michael Reilly was charged with rape and two counts of armed robbery. Two victims were involved. Defendants were jointly tried on all counts by a jury in the circuit court of Cook County. Defendant Madden was found guilty of rape and contributing to the sexual delinquency of a child and defendant Reilly was found not guilty of armed robbery but guilty of rape. Defendant Madden was sentenced to imprisonment for from 8 to 13 years and defendant Reilly was sentenced to imprisonment for from 6 to 9 years. Defendants appeal.

The issues presented for review are (1) whether defendant Madden's pretrial motion to suppress the identification testimony of one of the complaining witnesses should have been granted, (2) whether defendants were proved guilty of rape beyond a reasonable doubt, (3) whether the court erred in permitting the State, over defense objection, to introduce evidence not revealed in the State's answer to defendants' motion for discovery, (4) whether the court erred in its response to the jury's request, during deliberations, to examine defendants' exhibits and for a transcript of the evidence, (5) whether the prosecution committed prejudicial error in cross-examining defense witnesses, (6) whether the prosecution knowingly introduced false testimony and (7) whether the prosecution made impermissible and prejudicial comments during closing arguments such as to deny defendants a fair trial.

Consideration of the first issue requires an examination of the evidence adduced at the hearing on the motion to suppress the identification of defendant Madden made by the younger victim. She testified that she was 16 years old on January 7, 1972, the date of the offense. The police arrived at the scene between 6:15 and 6:30 p.m. and she gave a description at that time of her attacker, including that he wore a long gray coat which

reached below the knees, his height but not his weight, his voice and the appearance of the back of his head. She did not have occasion to see his face during the attack. The lighting conditions were "kind of dim." The police took her and the older victim to the hospital and then to the police station. On the way to the station, the policeman told them that two men had been arrested and she was being taken to the station to see if she could identify the man who had raped her. The older victim viewed the lineup first, while the younger victim waited in a separate room. The policeman who waited with her said nothing except that she was to wait. The older victim passed the younger victim, who was on her way to view the lineup, and told her she (the older victim) had identified the man who had raped her, but did not say which one in the lineup she had identified. The younger victim testified that there were 5 or 6 men in the lineup, but only one was wearing a gray coat. She did not recognize her attacker until she looked them all over and heard each of them speak. She never saw or spoke to the defendants before the attack.

On cross-examination, she testified that her initial description included that her attacker was a male Negro. She recognized him in the lineup by the back of his head and the back of his coat. The lineup was conducted about 1½ hours after the rape. She identified a photograph of the lineup and indicated the defendant Madden as the man she had identified. The police gave no names of the arrested persons to her prior to the lineup. The rapist had told her, at knifepoint, that if she didn't keep quiet or shut up, "I am gonna kill you." The attacker had nothing covering his mouth to muffle his voice, but "he talked low where you couldn't hardly hear him." She definitely recognized his voice at the lineup. She then pointed out defendant Madden in open court as the man who had attacked her.

Officer Minniefield testified that he was the first policeman to reach the victims at the scene of the offenses. He took a collective description from the two victims of the two assailants. He remembered the descriptions as being two male Negroes, 25 to 28 years old, 160 to 170 pounds, one wearing a three-quarter length black leather coat and the other wearing a three-quarter length corduroy type car coat. Each of the two victims identified only her own attacker, but he couldn't remember which victim described which attacker. He transported the victims to the hospital and then to the police station. By that time he had knowledge that two persons had been arrested and he told the victims that arrests had been made and they were going to the station for a "formal showup." He told them that they were to identify their individual assailants if they could. He did not tell the victims in any way whom to identify. His police report did not indicate a leather coat as being worn by either attacker, but it did indicate that a leather coat was taken from one of the victims.

Officer Smitka testified that he conducted the lineup at eight or nine

o'clock on the evening in question. He remembered that defendants were in the lineup and identified the photograph of the lineup. He could not tell from the black and white photograph the color of the coats worn by the lineup participants, and from the photograph it appeared to him that two of the participants wore coats that could be gray. The younger victim could not identify Madden by his facial features, but to the best of Smitka's recollection, she did identify him by his voice and his coat. Each lineup participant stated his name, address and occupation while in the witness' presence.

After hearing arguments, the court denied the motion to suppress Madden's identification, stating that the procedures were not so suggestive as to have led to Madden's identification, considering that the coat and voice identification could not have been prompted by the police.

> "In order to suppress an in-court identification on the ground of improper pre-trial identification procedures, a defendant bears the burden of proving two facts. First, he must establish that the pre-trial identification procedures were so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States*, 390 U.S. 377, 384; *People v. Holiday*, 47 Ill. 2d 300, 307-308.) Second, to the extent that suggestive procedures are established, they must be shown to have been 'unnecessary' under the totality of the circumstances. (*Stovall v. Denno*, 388 U.S. 293, 302; *People v. Lee*, 44 Ill. 2d 161, 169.) * * *." *People v. Tuttle* (1972), 3 Ill. App. 3d 326, 330, 378 N.E.2d 458, 460.

■■ Defendant Madden points out three instances of "suggestiveness" which he argues impermissibly tainted the lineup identification: the police told the younger victim on the way to the station that they had arrested two men and that the women were going to view a lineup to pick out the attackers if they could; the first victim to view the lineup told the younger victim in passing that she had identified the man who had raped her; and the younger victim had described her attacker as wearing a gray coat and only defendant, of the five men in the lineup, wore a gray coat. We find that the first instance was not suggestive, since the policeman was only stating the obvious. (*People v. Martin* (1974), 24 Ill. App. 3d 710, 715, 321 N.E.2d 368, 373.) The second instance was not occasioned by any police conduct; moreover, we do not find it to have been suggestive, where the first victim to view the lineup was not speaking about the other victim's attacker and in no way indicated to the latter which person she had identified. The victims had been attacked by different men and it does not necessarily follow that because one victim had identified the man who had raped her, the other victim must or should be able to identify her attacker from the same lineup. No one testified that the police had told

the victims before the lineup that the two men had been arrested together. As to the third claim of suggestiveness, the record reflects that defendant Madden was the only participant in the lineup who wore a gray colored coat. But in the absence of any evidence showing that Madden was required by the police to wear the coat, there can be no claim of impermissible suggestiveness such that the identifications should have been suppressed. (*Coleman v. Alabama* (1970), 399 U.S. 1, 6, 26 L. Ed. 2d 387, 395, 90 S. Ct. 1999, 2002.) It is clear that the witness identified Madden not only by his coat but also by the back of his head and his voice. The motion to suppress was properly denied.

At the trial, the evidence showed the following: The older victim was 21 on January 7, 1972; at about 5:30 p.m., she was walking with the younger victim in the vicinity of 800 North Ridgeway in the city of Chicago. The two went to a clothing store and then to a liquor store, where the older bought two boxes of Pamper diapers, and then began walking home north on the east side of Ridgeway. The older victim described the lighting as "kind of dark, just streetlights." The two had walked nearly a block when the older was grabbed from behind, around her neck, by someone who said, "Shut up or I'll kill you." She felt metal, which she thought was a knife, pressed to the left side of her neck. She could see that another person had hold of her companion, but could not see him clearly. Nor could she see the face of her attacker at this time. The two were forced into an area between two buildings and turned against the wall, their assailants still behind them. The older was asked if she had any money by the man holding her, who proceeded to go through her . purse, her pockets and the bags of merchandise she carried. She heard a whispered conference in two male voices, then was led out of that area, down the block one or two houses, through a gangway to the alley and then through another gangway which had no outlet, but led to a basement. She later learned the address to be 857 North Ridgeway.

Her assailant led her down four or five steps, turned her around and ordered her to remove her pants. She observed his face at that time. At this point in her testimony, she identified defendant Reilly in open court as the man who had attacked her. She refused to cooperate and the man struck her, knocking her down so that she hit her head. The attacker pulled her clothes down from the waist. She struggled against him and tried to call for help but was told, "Shut up white nigger bitch." She observed his face again as he climbed on her. She heard his zipper unzip. He inserted his penis in her vagina and moved in and out of her. She looked at his face the whole time.

She then heard a dog barking and a door open upstairs and a light came on from above. Some of the light partially illuminated the basement and she again observed her attacker's face. Light also shown into the

basement from a window next door which was illuminated. A dog ran down the stairs and her attacker stood up. A woman called, "Who is down there?" and her attacker ran up the stairs and out down the gangway. Her change purse containing $8 to $10 was gone.

She knew the woman who was coming down the stairs and she shouted to her, "Rose, we've been raped, I've got to call the police." Rose said to go on up. The older victim ran past her on the stairs to Rose's apartment, where she called the police. She did not see the face of the other man completely, but she could tell he had a high forehead, "his hair was high," and he wore a gray coat. Her own attacker had worn a black coat which reached his knees or slightly longer. The police arrived in a minute or so and she spoke to them in Rose's apartment. She was not married to defendant Reilly nor did she consent to the intercourse. She did not voluntarily give money to defendant Reilly.

The police took her to the hospital, where a doctor examined her, took smears and gave her a shot. She then went to the police station where she identified defendant Reilly, viewing the lineup alone, without the other victim.

She again pointed out Reilly in court at the trial and identified several photographs as accurately depicting the scenes she had testified about. She also identified her hose and the slacks she had worn before the attack and marked defendant Reilly on a photograph of the lineup.

On cross-examination, she testified that she was married at the time of the rape. The incident took about one-half hour. The lighting was dim. Both stores the two victims had visited were on the south side of Chicago Avenue. Although she never saw the object pressed to her neck, she was sure it was made of metal. Nothing was taken from her in the first gangway. The light from the house next door shined into the basement. She didn't notice her attacker's clothes other than his coat and a dark-colored pull-on hat, but she did note that he wore long sideburns and a little hair on his chin. "[H]e had like an Afro," but he never took his hat off. She didn't know if her clothes were torn when they were pulled off her. She didn't know if her body got dirty during the rape. The police arrived in no more than a couple of minutes. She described her own attacker as about 6 feet, 150 pounds, wearing a maxi-length black cloth coat. The other attacker was slightly shorter, wearing a long, lighter-colored coat made of heavy fabric, "like a corduroy material * * * I don't mean stripes like corduroy, I mean heavy material * * *." She didn't remember if the younger victim gave a description.

Two police officers took them to the hospital and then to the police station. The victims talked about the rapes and gave descriptions in the car on the way. The police told her that they had people in custody and that they were going to see if the victims could identify anyone. The

police said that the persons arrested seemed to fit the descriptions, but it was up to the witnesses to pick them out because the police didn't know who did it. She thought the police said that those arrested fit the description, but she wasn't sure.

At the lineup, she was told to pick out her attacker if she saw him. She was shown no photographs prior to viewing the lineup. The photograph ·of the lineup produced at trial shows one man besides Reilly was wearing a long black coat. She asked to have the men in the lineup speak, even though she was sure she recognized Reilly already, because she wanted to be doubly sure by hearing his voice. She admitted that she had testified at the preliminary hearing, one month after the rape, that she was not absolutely sure until she heard the defendant speak. She passed the younger victim after the lineup and told her that she had identified one person.

She further testified that it was possible she had had sexual intercourse with someone, perhaps her husband, on the day of the rape besides the rapist. There was a hole in the front of the pantyhose she examined at trial and identified as the hose she wore before the rape.

The younger victim testified that she was 16 at the time of the rape. After she and the older victim completed their shopping and were walking home, north on Ridgeway, she was approached from behind and grabbed. She saw a knife in her attacker's hand, which he held at her neck as he stood behind her. He forced her into a gangway, where she was searched. She identified the locations she testified about on the photographs produced at trial. The man then forced her down the street, past three or four houses, to another gangway, all the while holding his knife at her throat. Then he forced her down some stairs to the basement, where she observed the older victim and the other man. Her attacker turned her around, unzipped her coat and pulled her pants down. He then attempted to remove a ring from her finger, but her knuckle prevented it. She still could not see his face because he held her head to the side with the knife at her neck. He pulled her underpants off, unzipped his own pants but did not remove them, and pushed her back so that she hit her head against the cement wall. She was dizzied. He inserted his penis into her vagina. She then heard a dog barking and a light was turned on upstairs; she screamed, but stopped when her attacker told her, "Shut up or I will kill you." A dog ran down the stairs and the man jumped off of her. He then pulled off her coat and ran out. She observed the back of his head at that time and his coat, which was a long, gray midi-type cloth coat.

She then identified defendant Madden in open court as the man who had raped her. Madden had intercourse with her, she testified, without

her consent and against her will, and she was not and had never been married to him.

She further testified that when the older victim ascended the stairs to Rose's apartment, she followed her, screaming and crying. The older victim called the police, the patrolmen arrived and the women were taken to the hospital. The police then took them to a police station, where the witness viewed a lineup after the older victim told her that she had picked someone out of the lineup, but did not say which one. The younger victim then identified a photograph of the lineup and indicated defendant Madden's picture as that of the man she had identified. She had heard the attacker speak during the time he held her captive, although she never saw his face until the lineup. The police had each lineup participant state his name, address and occupation. She testified that she recognized Madden's voice, his coat and the back of his head in the lineup.

On cross-examination, she testified that the women had completed their shopping at about 6 p.m. The lighting on Ridgeway walking home was just streetlights and there were no lights on in the first gangway. There were no lights on in the basement; it was dark, but she could see because of light from a window across the gangway. She only saw the back of the head of the other assailant and noted that his coat was dark colored. She did become dirty from lying on the ground. The defendant did not have an emission inside her. She gave no description to anyone before going to the hospital or to the police department. On the way to the station the police told her that she would view a lineup. She admitted testifying at the motion to suppress hearing that the police told her in the car that two men had been arrested. The first description she gave at the police station included the long gray coat, a height of taller than she was, and the back of his head. She never heard him speak prior to the rape. The back of his head was distinctively shaped, "Like a point, come like a point, and it was a little bit bushy." Only one person in the lineup wore a long gray coat.

The witness denied having her memory refreshed by the State's attorneys before trial or through reading a transcript of her earlier testimony. On redirect examination, she testified that she knew her interrogator was an assistant State's attorney and denied that she talked to him on the day of trial.

Dr. Vincent Costanzo, M.D., testified that he examined the victims on the day of the rapes at 6:45 p.m. Examination of the younger revealed a superficial laceration at the vestibule of the vagina and an intact hymen. He took vaginal smears from each woman and gave penicillin injections to each. On cross-examination, he testified that an intact hymen indicates a lack of complete penetration. He observed no active bleeding. The laceration he observed was external and not usually seen in rape cases.

There were no other marks or bruises on the women's bodies. He took two smears from each woman and gave one of each to the police.

Rose Sobie testified that she returned home on the day in question shortly after 6 p.m. Her dog behaved in a strange manner, growling at the back door instead of greeting her enthusiastically as was his habit. She switched on the light in the kitchen and opened the back door and the dog ran down the steps into the basement. The witness identified photographs of the scene as accurate depictions of the basement's condition. She corroborated the older victim's report of the rapes and the hysterical condition of the younger victim.

Officer Minniefield of the Chicago Police Department responded to a rape call on his vehicle's radio, arriving at the scene within one minute of hearing the bulletin. He observed the victims and their conditions. He spoke to the women for about one minute and then transmitted a description of the attackers on his portable radio. He and his partner searched the immediate area, then returned to the apartment and took the victims to the hospital.

On cross-examination, he testified that his report indicates he arrived at 6:10 p.m. The squad car was within 10 blocks of the scene when the call was received. The older victim gave the descriptions; the younger was only interjecting information at intervals. The initial descriptions he remembered were one male Negro, five feet eight inches tall, 160-170 pounds, wearing a three-quarter length gray car coat; and another male Negro, five feet eight to ten inches tall, 160-170 pounds, wearing a three-quarter length brown corduroy coat, "I think." The assailants carried shiny objects, believed to be knives. The policemen took the victims to the hospital and then to the police station, and told them in transit that suspects had been arrested that matched their descriptions and that the women would view a lineup. His cursory search of the scene of the crime revealed no weapons or money. The colors of the coats worn by the offenders he described were the colors he remembered the women gave him.

A witness from the Chicago Crime Laboratory testified that the slide containing the older victim's vaginal smear revealed the presence of sperm, but the smear taken from the younger victim did not reveal the presence of sperm. It was stipulated that the laboratory technicians had examined several articles of clothing and their examination revealed that the white pantyhose had no damage of recent origin; a mucus-type deposit was found in the crotch area, but no blood or sperm was evident; the blue slacks revealed no recent damage, no sperm, and no blood; the undergarments taken from defendants Reilly and Madden revealed neither sperm or other mucus deposits nor blood.

Patrolman Petrusonis, the arresting officer, testified that after hearing a

report of rape on his vehicle's radio, he drove to Ridgeway and Chicago Avenues with his siren and light operating. The radio description he had heard had described the offenders as one wearing a long black coat and one wearing a long gray coat. He saw two male Negroes wearing such coats near the intersection, so he stopped them, put them under arrest and advised them of their rights. He identified the men he arrested as the defendants in open court. The men he arrested then told him they were on their way to Woolworth's to purchase thread. The officer witnessed a lineup held after 8:30 p.m. that day. He described the lineup and saw the victims pick the defendants out of the lineup array.

After refreshing his recollection from his report, Petrusonis, on cross-examination, testified that upon patting down the defendants he found only a toenail clipper and an insignificant amount of money. The defendants did not attempt to run when he pulled his car over. The arrest was made at 6:18 p.m. The streetlights were on at the time. He did not notice dirt on the clothing of defendants.

On redirect examination, the witness testified that the defendants appeared happy and carefree until the lineup was conducted, at which time they appeared sober. He did not inventory the toenail clipper.

Patrolman Chiesla testified that he was Petrusonis's partner in the patrol car and assisted in the arrest of the defendants, whom he pointed out in open court. He then testified that a toenail clipper was found on one of the defendants and "a part of a Pamper Box that was folded up in the rear pocket of Arthur Madden." Defense counsel moved for a mistrial on the ground that the existence of a piece of Pamper box was not disclosed by the State in its answer to defendants' discovery motion. The motion was denied.

On cross-examination, the witness admitted refreshing his recollection from his notes prior to trial. He had held the piece of Pamper box in his hands, but didn't closely examine it until it was placed on the desk in the police station. He did not know what happened to it or the toenail clipper afterwards and the items are not mentioned in his report. Defense counsel again moved for a mistrial because the evidence came as a surprise and, when the motion was denied, moved that the testimony relating to the piece of Pamper box be stricken on the grounds that there was no foundation for the testimony, making it irrelevant. This motion was denied.

It was stipulated that defendant Reilly was 21 and defendant Madden was 27 at the time of trial. The State rested and the court granted a directed finding of acquittal as to one count of armed robbery against defendant Reilly. The defense motion for acquittal was denied as to the other four counts.

Arthur Madden testified on his own behalf that on the day in question

he met Michael Reilly at about 4:30 p.m. at Reilly's house. The two men went to the corner of Lawndale and Chicago Avenues for a drink. Madden argued with the saleswoman and thereafter they left the premises and went to Madden's house. Some police came to the house, arrested Reilly and Madden's cousin and took them to the liquor store. Madden next saw Reilly at 5:50 or 5:55 at Reilly's house. Reilly told him that Reilly's sister had talked the police and the woman at the liquor store out of arresting him. Madden and Reilly stayed at Reilly's house for five or ten minutes, then left to buy some thread at about 6:05. He knew it was just after six because Reilly's sister had wanted them to go to a meat store but it had closed at six. It was dusk, but streetlights were on. They walked north on Lawndale from Reilly's house at 727 North Lawndale and crossed Chicago Avenue to the side where the Woolworth's store was located. At this point the police arrested them. He had 40 or 50 cents but no toenail clipper or piece of Pamper box on his person when arrested. He did not rape or rob either victim. He was told he was arrested for robbery at first, but then was told it was for rape ten minutes later.

On cross-examination, Madden testified that he knew what time things happened because he wore a watch. He had 40 or 50 cents when he went to the liquor store to buy wine; Reilly had a little change. He did not remember what the argument in the liquor store was about. He did not know the lady in the liquor store. He did not know if Reilly's sister was married or single; her name is Eleanor Reilly. The officers took only change from Reilly. On redirect, he testified that he now knew the name of the woman in the liquor store to be Sandra Moore.

Michael Reilly testified on his own behalf that on the day of his arrest he lived at 727 North Lawndale with his sister and her five children. He went to a liquor store with Arthur Madden and they bought a bottle of white port wine. He had $1.50 before they went to the store. Madden "called the girl [who worked behind the counter] a name or bitch and then they got into an argument." The men left and went to Madden's house at 726 Lawndale and ten minutes later the police arrived and arrested Reilly and Madden's cousin and took them to the liquor store. The police held them about 40 minutes until Reilly's sister Eleanor talked the lady and the police into releasing him. He then went home and he and Madden left to buy some thread for a pair of pants. Eleanor was angry with him because the meat market had closed at six. He was then arrested, at which time he had in his possession 50 cents, his wallet and a small fingernail clipper. He had never been at 857 Ridgeway because "blacks weren't allowed over there back then." He did not rape or rob either victim on that date.

On cross-examination, Reilly testified that his mother had discarded the coat he wore when arrested a couple of years after he had been charged. The bottle of wine had cost $1.10 and the argument erupted after the

purchase. He did not leave his name and address at the liquor store. The police car did not have its lights on or its siren sounding when it pulled over. Bright lights blocked his view of the lineup witnesses, so he did not see the witnesses at all on the date of the rapes.

Sandra Moore testified that she was working in the liquor store on the day in question and she recognized Madden and Reilly at trial as the men with whom she had quarreled on that date. Madden had called her names and hit her in the head with a cupcake. She called the police and watched where the men went when they left and so was able to direct the police to the house. The police brought Reilly back to the store. Reilly's sister talked to her and then everybody left, the police telling her to come to the police station the next day to file a complaint if she wished.

On cross-examination, she testified that she did not file a complaint. She did not sell defendants any wine because she was not 21 years old on that date. She did not remember the exact date and told a State's Attorney's investigator it was in December or January or February, but at trial she was sure it was in January of 1972. During the argument she called defendants some names back and threw a little axe at them.

Eleanor Gordon, defendant Reilly's sister, testified that she arrived home from work on the day of the crimes at 5 p.m. and discovered that her brother Michael was in trouble. She went to the liquor store and talked to the girl behind the counter for thirty to forty-five minutes; then Michael was released. She went home with her brother. Arthur Madden came to the house. She sent the two men out to buy thread at five or ten minutes after six; she knew it was after six because she was mad at Michael for getting into trouble and causing her to miss getting to the meat market before it closed at 6 p.m. She later learned that Michael had been arrested.

On cross-examination, she testified that she did not go to the police station when she learned that Michael had been arrested on the rape charge. In response to questions allowed over objections by defense counsel, she admitted that she did not testify at Reilly's preliminary hearing, or before the grand jury, or at the hearing on the motion in April 1973. She denied ever speaking to a State's Attorney's investigator or refusing to cooperate with such an investigator. She admitted Reilly was her brother, but stated, "I would tell the truth on my brother."

On redirect examination, she testified that Reilly had retained no attorney at the time of the preliminary hearing, that no one ever asked her to testify at any hearing and she had never been served with a grand jury subpoena. She said she would have appeared at any of these hearings if she had been asked.

The defense offered into evidence the written report of the crime laboratory containing the findings as to the clothing exhibits examined.

The State objected because the evidence had been admitted through the stipulation which had been read to the jury. The objection was sustained. The defense rested.

After the jury had retired, the jurors sent a note to the judge containing two questions, "We were not given the defendants' exhibits. Are we entitled to see them?" and "Are we entitled to a transcript of the trial?" The court discussed the matter with the attorneys for the parties, remarking that the defense had introduced no exhibits and that supplying a transcript is discretionary with the court. Defense counsel moved for a mistrial. The court discussed his proposed answers with the attorneys, denied the motion for mistrial and gave the following responses over defense objection: "You are entitled to all exhibits which are admissible. Those that you have received are the exhibits of all parties which you are entitled to receive and which [are] admissible." "You have heard all the evidence and your decision or decisions will be based on all of the evidence you have heard."

The jury returned verdicts of guilty against Arthur Madden for rape and contributing to the sexual delinquency of a child, and guilty against Michael Reilly for rape, but not guilty of armed robbery. After defendants' post-trial motion was denied, defendants were each sentenced on their respective rape convictions; the conviction of Arthur Madden for contributing to the sexual delinquency of a child was merged into his conviction for rape and he was not sentenced thereon.

■■ Defendants contend that they were not proved guilty of rape beyond a reasonable doubt. It is well settled that it is the function of the jury to pass upon the question of an accused's guilt and that a court of review will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. (*People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465, 469, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 562, 97 S. Ct. 1600.) It is also well established that the trier of fact is not required to accept alibi testimony over the positive identification of the accused. (*People v. Whitely* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.) We have examined the record in detail and find the evidence sufficient to prove defendants guilty beyond a reasonable doubt. The rape victims positively identified the defendants as their attackers at a lineup conducted within three hours of the time of the crimes. They did not collaborate before or during the lineup procedure. Each positively pointed out her own attacker at trial. The defendants were arrested in each other's company within two blocks of the rape scene and within 15 or 20 minutes of their flight from the scene. Though there were some inconsistencies between their appearance at the time they were arrested and the descriptions testified to by the victims and the police, these inconsistencies related to the color of one attacker's coat and one

attacker's age and were, in our judgment, adequately explained at trial. While the lighting conditions during the time the victims were held captive by their attackers were not the best, there was testimony by the victims that there was sufficient light in the basement at the time defendants fled for the victims to observe them. We also conclude that the younger victim could properly identify defendant Madden by his coat, his voice and the back of his head where she had an opportunity to observe each of those features when her attacker fled. The facts that she picked Madden out of the same lineup from which the older victim had previously picked out Reilly and that Madden and Reilly had been arrested together cannot be completely explained as coincidence. Against this evidence of guilt, defendants provided alibis for each other, supported by the testimony of the sister of one of the defendants and the testimony of Sandra Moore, who could not be certain of the exact date of the altercation she described. We note the absence of any evidence from the police department to support the alibis. After having carefully reviewed the record, we cannot say that a reasonable doubt of guilt is established by the record. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; see *People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305; *People v. Martin* (1977), 46 Ill. App. 3d 943, 361 N.E.2d 595; *People v. Jones* (1973), 11 Ill. App. 3d 450, 297 N.E.2d 178.

Defendants argue that it was error to admit the testimony of Patrolman Chiesla concerning the piece of cardboard from a Pamper box which he saw his partner discover in defendant Madden's pocket, because the State did not disclose this evidence in its answer to defendants' discovery motion and because there was no foundation laid to show its relevance to defendants' guilt. While it is true that the relevance of the testimony was never established through evidence that the box of Pampers carried by the older victim had ever been torn or taken by defendants and therefore should have been excluded (*People v. Newbury* (1972), 53 Ill. 2d 228, 240, 290 N.E.2d 592, 599), a more serious question is presented by the failure of the State to reveal its knowledge of this information in response to defendants' discovery motion.

■■ Defendants claim that Supreme Court Rule 412 (Ill. Rev. Stat. 1975, ch. 110A, par. 412) was violated. That rule states in pertinent part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

\* \* \*

(v) any books, papers, documents, photographs or

tangible objects which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused; * * *."

The discovery motion of defendants specifically requested disclosure of everything listed in subparagraph v. The State's answer made no mention of the piece of Pamper box, but merely invited the defense to examine all reports and statements in its files which were available for inspection and copying. It is apparent, however, that such an examination could not have revealed this evidence because the police had neither inventoried it, preserved it for trial, nor mentioned it in their reports. Defendants denied any knowledge of the existence of the piece of cardboard. These facts distinguish the case at bar from *People v. Anthony* (1976), 38 Ill. App. 3d 190, 197, 347 N.E.2d 179, 184, where the existence of a garbage bag and its contents was disclosed but a list found in the bag was not; *People v. Britt* (1974), 22 Ill. App. 3d 695, 700, 318 N.E.2d 138, 143, where the existence of a wallet and "miscellaneous papers" was disclosed but that some of the papers were payroll checks was not; and *People v. Schabatka* (1974), 18 Ill. App. 3d 635, 642, 310 N.E.2d 192, 197, *cert. denied* (1975), 420 U.S. 928, 43 L. Ed. 2d 400, 95 S. Ct. 1128, where the defendants were fully aware of the existence of a burned automobile before trial and the State excused its failure to produce the car by claiming it never possessed it. The State argues here that the material was not within its possession or control, but this argument begs the question; the rule clearly and unambiguously requires disclosure of "information" in the State's possession, as well as "material." From the examination of the police officers at trial, it appears the State was aware of the piece of cardboard and was eliciting testimony concerning it deliberately. We conclude that it was error to admit the testimony concerning the piece of Pamper box because of the failure of the State to disclose before trial that it had the information in its possession which had been obtained from the accused. Rule 412(a)(v).

In our opinion, however, this error does not require reversal. Defense counsel vigorously argued to the jury the conflict between the testimony of Petrusonis and the testimony of Chiesla. The jury also had before it a photograph of the bags containing the boxes of Pampers discovered at the scene, and which reveals no apparent tearing or other damage to the bags or the boxes. The proof of guilt was so convincing that we conclude, beyond a reasonable doubt, the jury would have found the defendants guilty of the offenses even if the evidence had not been admitted. (*People v. Newbury* (1972), 53 Ill. 2d 228, 240-41, 290 N.E.2d 592, 599.) Defendants' argument that this was the only physical evidence connecting them to the scene of the crimes does not account for the nailclipper,

which Reilly admitted having on his person when arrested and which could have felt like a knife when held at the throat of the victim.

■■■ The defendants make three attacks on the response of the court to the note sent by the jury during their deliberations. After writing down the answers to the questions, the court directed the bailiff to take the paper to the jury and communicate to them that he was returning "the questions submitted and the answers thereto, and they are to return with their verdict." Defendants first argue that it was improper for the bailiff to carry the communication instead of the court instructing the jury in open court and that the last-quoted phrase was a deadlock instruction, prohibited by *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. We find this argument was never presented to the trial court and is therefore waived. Further, we find no error in the bailiff carrying the note because it was composed by the judge in the presence of the defendants and defense counsel (*People v. Adams* (1967), 36 Ill. 2d 492, 498-99, 224 N.E.2d 252, 256), and we do not believe that the direction to the jury to return their verdict can be fairly construed, in its context, to be a deadlock instruction. There is no indication that the jury was deadlocked at this time and the direction of the court was not in any way as coercive as the lengthy instruction delivered by the trial court in *People v. Prim* (1972), 53 Ill. 2d 62, 71-72, 289 N.E.2d 601, 607.

■■ Secondly, it is argued that the court's answer to the first question was improper because the question allegedly revealed that the jury was confused and the court at that time should have permitted the defendants' offered exhibit, consisting of the laboratory report on analysis of the physical evidence, to go to the jury. Before the exhibit was offered into evidence, the parties had stipulated to its contents and its contents were read to the jury. Under those circumstances, it was not an abuse of discretion for the court to refuse to admit the report as a defense exhibit.

Because the defense had not had any exhibits admitted into evidence, the instruction of the court in response to the first question was not only correct, but calculated to not emphasize the fact that the jury had received no defense exhibits because there were none. *People v. Autman* (1974), 58 Ill. 2d 171, 176, 317 N.E.2d 570, 572; *People v. Williams* (1975), 60 Ill. 2d 1, 13, 322 N.E.2d 819, 825-26.

The third contention is that the court erroneously failed to exercise his discretion to allow a transcript of the trial to go to the jury. Contrary to defendants' arguments and in contrast to the facts in the cases cited by defendants in support (*People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166; *People v. Autman* (1974), 58 Ill. 2d 171, 317 N.E.2d 570; *People v. Jackson* (1975), 26 Ill. App. 3d 618, 325 N.E.2d 450), the record explicitly

reveals that the court here was aware of the discretion vested in him to order a transcript for the jury's use. The court noted that no daily transcript had been prepared by the several court reporters who had recorded the testimony, that the jury had been attentive during trial and that his belief was that a transcript might lead to picking and choosing evidence rather than deciding the case on all the evidence. The court stated in *People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577, 578:

> "This question of review, like so many others which appear in the course of trial, is best entrusted to the trial court's sound discretion.
>
> A decision within the trial court's discretion will not be disturbed on appeal unless there has been an abuse of discretion."

Defendants have not argued that the court abused its discretion, nor can we say from our examination of the record that the court abused its discretion.

■■ Defendants next complain of three instances of allegedly improper cross-examination of defense witnesses. However, in the instance of the cross-examination of defendant Reilly as to the whereabouts of his coat and in the instance of the cross-examination of Sandra Moore as to when she told an investigator the argument occurred there was no objection raised at trial and no mention of the alleged errors in defendants' post-trial motion. Therefore, these matters have been waived. Nor do these matters constitute plain error under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 615).

As to the third instance, the cross-examination of Eleanor Gordon concerning whether she had testified to the defendants' alibi at the pretrial hearings or before the grand jury, the record discloses vigorous objections by defense counsel but no mention of this alleged error in the post-trial motion. This, too, has been waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.) Even had it not been waived, we conclude the error, if any, was cured by defense counsel's rehabilitation of the witness on redirect examination and by the argument defense counsel was permitted to make to the jury on the issue and was harmless in light of the convincing evidence of defendants' guilt.

■■ Defendants next argue that their convictions were the result of perjured testimony by the younger victim and by either Officer Petrusonis or Officer Chiesla. It is asserted that the younger victim must have lied when she testified that she did not speak to or review her testimony with the prosecutors before trial and that this is apparent in the record because, on redirect examination, she acknowledged that she realized who the assistant State's attorneys were and maintained she had not spoken to them before trial. Her cross-examination and redirect testimony that she never spoke to the prosecutors before trial were consistent and there is no evidence in the record that her statements were not true. The State's

attorneys were never called by the defense to impeach the statements. (See *People v. Werhollick* (1970), 45 Ill. 2d 459, 259 N.E.2d 265.) Defendants' argument that the younger victim must have been prepared as a witness before trial by the prosecutors is speculative and will not be considered further. It is also asserted that because Officer Petrusonis testified he found only a nailclipper·as a result of his search of defendants and Officer Chiesla testified he saw Petrusonis discover not only the nailclipper but also the piece of Pamper box, one of the two policemen must be lying. This conflict in the evidence, however, is not of such extent and character as to lead us to conclude that perjury was committed; rather, it can be explained, as the State suggests, by a lapse of memory by Petrusonis. We cannot find that a conviction must be reversed on direct appeal because of perjured testimony where the alleged perjury does not clearly appear of record. (*People v. Hoskins* (1962), 25 Ill. 2d 333, 336, 185 N.E.2d 214, 216.) Under the circumstances, the discrepancy in the evidence goes only to the credibility of the witnesses. (*People v. Smith* (1968), 41 Ill. 2d 158, 163, 242 N.E.2d 198, 200, *cert. denied* (1969), 396 U.S. 852, 24 L. Ed. 2d 101, 90 S. Ct. 111.) We note that the apparent conflict between the officers was vigorously argued by defense counsel to the jury and we have concluded above that the admission of the testimony in question was harmless error.

■■ Finally, defendants argue that certain comments of the prosecutors during closing arguments to the jury were impermissible and denied defendants' rights to a fair trial. We have reviewed the transcript of the closing arguments and conclude that the majority of defendants' complaints are without merit. Comments that the defendants "know how to dress for trial" and that a "street-wise" person would dispose of weapons and stolen property before arrest cannot be fairly read as implying defendants were experienced criminals. It was proper for comment to be made on the fact that defendant Madden not only argued his alibi but in the alternative that there had not been penetration. Suggestions that defendants' alibi defense was a recent fabrication was proper where there was some competent evidence to support such a conclusion. The most serious incident complained of is that the prosecution impermissibly commented on the silence of defendants at the time of their arrest by stating:

> "You didn't hear any officer testify that these two guys shouted out that they were just over at their sister's, that they were arrested that morning or late in the afternoon. They didn't say anything like that to any officer."

It is asserted that this comment violated the rule established in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, that an arrested person's silence at the time of his arrest may not be used against him for

the purpose of impeaching an explanation he gave at trial, after he had been assured, through *Miranda* warnings, that his silence would not penalize him. However, the rule has no application here, where defendants did not remain silent but stated that they were on their way to purchase thread at the time of their arrest. Since this explanation made no mention of their alibi as asserted at trial, we conclude it was fair comment and did not tend to deprive defendants of a fair trial.

■■ Although not raised by defendant Madden, his conviction for contributing to the sexual delinquency of a child must be vacated, even though no sentence was imposed. The rape charge for which he was convicted and sentenced and the contributing to the sexual delinquency charge were founded on a single act by him. Under such circumstances, there can be but one conviction of crime. *People v. Lilly* (1974), 56 Ill. 2d 493, 496, 309 N.E.2d 1, 2. See also *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.

■■ Two other matters require comment. Defendants have moved to strike as violative of Supreme Court Rule 341(e)(6) those parts of the State's statement of facts in its brief setting out the defendants' evidence. (Ill. Rev. Stat. 1975, ch. 110A, par. 341(e)(6).) That part of the Rule provides:

> "Statement of Facts * * * shall contain the facts necessary to an understanding of the case, without argument or comment * * *."

In its statement of the defendants' evidence, the State prefaces all of its references to that evidence with "claims," "alleges," "allegedly," "purported," "purportedly," "acknowledged" or "further acknowledged." The use of these words in this manner is clearly argumentative and is in direct violation of Rule 341(e)(6). We are confident that this violation will not be repeated in the future. For that reason, the motion to strike is denied in this case.

The State has moved to strike a portion of the reply brief of defendant Madden because it charges the State has attempted to "perpetrate a fraud" on this court. The background of this charge is: In his brief, Madden argued that the trial court erred in denying a motion to strike the testimony concerning the piece of Pamper box where no foundation was laid for its admission. In response, the State contended that this argument was waived because the record clearly demonstrates no objection was offered by defense counsel which specified that the State failed to lay a proper foundation for this testimony. However, the record clearly shows, as defendant points out, that that specific objection was made. The State now seeks to justify its misstatement on the ground that no *timely* objection was made. While we do not condone, but in fact condemn, the State's action in this regard, we deny the motion to strike as we, as stated

above, have found that the admission of this evidence does not require a reversal.

The conviction of defendant Madden for contributing to the sexual delinquency of a child is vacated. In all other respects the judgment of the circuit court of Cook County is affirmed.

Vacated in part and affirmed in part.

GOLDBERG, P. J., and McGLOON, J., concur.