THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* VITTORIO SMITH, Defendant-Appellant.

First District (5th Division)   No. 77-1865

Opinion filed March 16, 1979.—Rehearing denied April 12, 1979.

Howard T. Savage, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ann Callum, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and sentenced to a term of four to 10 years imprisonment. On appeal he contends that he was not convicted beyond a reasonable doubt.

At trial, the following pertinent evidence was adduced.

*For the State*

*Ronald Buckhalter*

On June 13, 1975, he, his cousin William James, and Larry Hibbler were working at his father's Citgo Service Station at 7458 S. Jeffery in Chicago. At midnight, which was closing time, he locked up the station. He took the day's receipts, which came to $325.43, and the inventory sheet which James had filled out, and put them in his pocket. He, James and Hibbler then drove to the 7400 block of Euclid, parked and entered a party being held in the basement of a house. There was an entry fee of 50 cents per person, and he paid this fee for James and himself. After staying for five or 10 minutes and observing that there were "no young ladies down there," he, James and Hibbler left the party and headed for their car. As they left the house, defendant Vittorio Smith and another man whose name he doesn't know approached them. Smith told all the other people to go, "threw" a gun to his stomach, and said it was "a stick-up." He gave Smith all the paper currency he had, which was $322, but kept the change in his pocket. Smith also took approximately $2 from William James. Smith told them to run back toward the house. He and James did

this, but then turned around, went back to Euclid, and went to the E-Z Go Gas Station to call the police. Some people at the station told him that the police were already there. He ran over to the police, who were standing at 75th Street and Euclid, and saw that Smith was lying diagonally on 75th Street. He told the police that Smith had "just stuck me up" and taken $322. The police officer "went to the fella's [*sic*] pocket I think it was and he pulled out this money" which he counted. The officer then called a squadrol to take Smith to the hospital. Buckhalter followed them to the hospital, spoke with the police, and showed them the inventory list for the day's receipts from his father's service station.

On cross-examination, he stated that the "take for the day" from his father's gas station was $322.43, and that he left the party because "there were not many young ladies down there." He denied seeing a dice game at the party, and acknowledged that he doesn't really know what a dice game looks like. He denied taking the $322 out of his pocket while at the party or telling anyone he had it, or leaving it bulging or sticking out of his pocket. He acknowledged that when he saw Smith lying in the street he did not see a gun or a cap in the area, and that he saw the money clutched in Smith's hand.

On redirect examination he stated that the money was originally clutched in Smith's hand, that one of the police officers took the money and put it in Smith's pocket, and that after he told the police that Smith had just robbed him, the police officer took the money out and "counted it I assume." He does not know the present whereabouts of the inventory list which he showed to the police.

*William James*

He corroborated Buckhalter's testimony, and identified defendant Vittorio Smith as the man who robbed them at gunpoint. He put the day's gas station receipts at $323 and approximately 50 cents in change. He gave the money and the sheet listing the day's receipts to Buckhalter. He saw Buckhalter give that money to Smith when they were robbed, and stated that he also gave Smith one or two dollars that he had in his pocket. After he and Buckhalter came to where Smith was lying unconscious on 75th Street, they had a conversation with the police. A police officer then bent down and removed their money from Smith's pocket. He did not see a gun on the street where Smith was lying, and he did not see the fellow who had been with Smith earlier. He did not play dice at the party or see a dice game in progress.

On cross-examination, he acknowledged that there were "fellows and girls" at the party, but not as many women as men. He conceded that he was not sure that the police officer removed the money from Smith's pocket, but stated that he did not see any money in Smith's hands.

*Leon Armistead, Chicago Police Officer*

In the early morning of June 14, 1975, he and his partner, William Hopkins, were patrolling in civilian dress in an unmarked squad car. As they approached the intersection of 75th and Euclid, he observed two male Negroes running south on 75th Street. One of the men ran quickly across the street, across the South Shore High School baseball field, and out of his sight. He noticed that traffic in the intersection had stopped. He approached the intersection and saw lying on the ground a person who apparently had been struck by the vehicle which was stopped two or three feet away from him. This person, whom he identified as defendant Vittorio Smith, was one of the two male Negroes he had seen run into the intersection. Because Smith was unconscious, he told his partner to go call for a squadrol or ambulance to take Smith to the hospital. He saw a male youth remove something from Smith's hands. He told the youth to give it to him, and then discovered that it was money. He stuck the money into Smith's back pocket. Ronald Buckhalter and William James then approached him and his partner, and stated that Smith had just robbed them. After a conversation with Buckhalter, he went into Smith's pocket, removed the money he had placed there, and determined that the amount was $322. Buckhalter showed him a "totaled out checkout" receipt from a gas station. Smith was taken to Jackson Park Hospital. He did not recover any of the money or a gun or dice from Smith.

On cross-examination he acknowledged that Mr. Briggs the driver of the car which struck Smith, was shouting, "I couldn't help it he ran out in front of the car." He stated that he did not see or hear the sound of Smith being hit by a car. He acknowledged that he did not see a leather cap in the vicinity.

*For the Defense*

*George Richmond*

On the evening of June 13, 1975, he had a party in the basement of his house at 7450 S. Euclid. Admission to the party, which was "open," cost $1. Between 11:30 p.m. and 12 in the back of the basement, 17 to 20 people were shooting dice. There were two women in that group, and more women up front where people were dancing. He saw Ron Buckhalter playing in the dice game at his party. He also saw Vittorio Smith and a friend of Smith's who he knew as "Little Vic." At approximately 12:15 a.m. or 12:30 a.m. he went outside to find out why the number of people at his dice game "fell off." He saw that a group of people, including Smith and Ron Buckhalter, were playing dice on the street and using "loaded" dice. At approximately 12:30 he went to 75th and Euclid and saw Smith lying on the street.

On cross-examination he conceded that the gambling at his party was not licensed and was not for any charitable purpose. He acknowledged that he was introduced to Smith for the first time on the night of the party, and did not know if Smith carried a gun. He conceded that he has been convicted of armed robbery. He admitted that he did not know whether people were shooting dice on the street or whether any dice used there were "loaded."

*Victor Nathaniel Jackson*

He is called "Little Vic" and is a friend of defendant Vittorio Smith, who is called "Big Vic." On June 13, 1975, at approximately 10:30 p.m., he and Smith went to a party given by Harry Kendall at 7450 South Euclid. They played dice in the back part of the basement and, after about 20 minutes, he lost his money. He, Smith, Henry Carrol and Larry Cozy then drove to Smith's house, where Smith picked up some more money. They went back to the party and rejoined the dice game. After about 15 minutes, Paul Strickland came in and said there was a better dice game outside. Smith gave him $50, and the two of them joined the dice game on the street. It rained earlier, but had stopped by the time they started to play. They played in that game, used "fixed" dice, and won almost all the money. Smith collected the money they won. After about 20 minutes they left the game and walked south on Euclid to 75th Street. People in the dice game were calling to them to come back, but they turned around and said that they were through. As the people began to walk towards them, Smith started walking ahead of him. Smith had the money they won in the dice game all balled up in his hand. He was straightening it out, and he put it in his pocket. When Jackson reached the corner of 75th and Euclid, Smith was crossing the street, but was looking back at him. He saw a car coming and told Smith to "look out." The car hit Smith and dragged him down the street. Smith was lying in the street where the car had stopped, "like he was dead or something," and a group of people were crowded around him. He did not see money or anything else in Smith's hands. Danny Newtal came up to him and told him that he should go and tell Smith's mother what had happened. He and a girl named Tina then ran to Smith's house, taking a short cut towards South Shore High School and across the adjacent park. He never left Smith from the time they played in the dice game in the basement until the time that Smith was hit by the car. He never saw Smith aim a gun at two people coming out of Harry Kendall's house, and never saw Smith take money from people coming out of that house.

On cross-examination, he was unable to recall what Smith wore that evening. He conceded that he and Smith had a dice-shooting partnership, and, while at Smith's house getting more money, decided to use "fixed" or

"crooked" dice. He acknowledged that he did not see any police by Smith while he was lying in the street after the accident.

*Anna Smith*

She is Vittorio Smith's mother and lives with him at 7831 South Cregier. Shortly before 10 p.m. on June 13, 1975, she saw her son and his friend Victor Jackson at her house. The two of them left for a party, but returned to her house between 11 p.m. and 12. After a conversation with her son, she let him have his money, which was in a drawer in her bedroom. She worked for the City of Chicago's Department of Human Services, while her son worked for the City of Chicago's Department of Streets and Sanitation. They had both been paid that day, she had cashed his check and knew that she had approximately $320 of her son's money in her drawer. Sometime later that evening, she received a phone call from someone at the emergency room at Jackson Park Hospital. At about the same time, Victor Jackson and a young lady came to her house. After conversations on the phone and with Jackson she went to Jackson Park Hospital. She saw 25 or 30 people, some of whom she knew standing around the entrance of the hospital. Inside the hospital she saw Officer Armistead, and three persons he introduced to her as James, Hibbler and Buckhalter. Armistead talked to her and showed her a smooth white piece of paper with letters and numbers on it. Armistead told her that her son had robbed Buckhalter's gas station and was hit by an automobile while running away from the robbery. As Armistead told her this, Buckhalter interrupted and said, "Yes, he did rob my gas station." Armistead said, "Wait a minute. Didn't you tell me the station was closed?" Buckhalter answered, "Yes, it was, but he robbed me outside the station." She then said, "No, my son went to a party at 74th and Euclid," and Buckhalter said, "Yes, he did go to a party, but he robbed me outside of the party." Danny Newtal, who had been in the group outside, then interrupted them and claimed that he saw Armistead putting money into her son's hands. After this conversation, she went to the emergency room and saw her son.

On cross-examination, she could not recall whether her son wore a cap, but did recall that it rained that night. She admitted that the check she cashed for her son was for $207.37 and that she does not know how much more was in the drawer or how much he took out. She stated that her son put some money in the drawer, but she did not know the amount.

*Defendant Vittorio Smith on his own behalf*

He corroborated Victor Jackson's account of their arrival at the party at 7450 South Euclid of their gambling with dice there, and of their return to his house at approximately 11 p.m. on June 13, 1975. At his house he asked his mother for money, and took $100. He further corroborated Jackson's account of their return to the party and entry into the dice game

held outside. When he got to that game he had close to $220, and gave $50 of it to Jackson. He and Jackson played in the game, used "bad" dice, and won some money. After 15 or 20 minutes he and Jackson quit the game and began walking towards 75th Street. He counted his money as he walked and counted $420, not including single dollar bills. He did not complete his counting because the crowd he and Jackson had left behind started calling and walking towards them. It had rained earlier that night, but it was not raining then. He picked up his walking pace, and was approximately 15 feet ahead of Jackson. As he crossed 75th Street, he was looking back at the people who were still coming towards him. The next thing he remembers is that he woke up three days later in Jackson Park Hospital with handcuffs on his bed and his mother sitting next to him and crying. He did not have a gun that night, and did not take money at gunpoint from Ronald Buckhalter or William James.

On cross-examination, he acknowledged that he does not know if he was wearing a cap when he was struck by the car, and stated that he was "not sure" if he wore a cap when he left his house earlier in the evening. He stated that he won some money from Buckhalter while playing dice, but did not know how much he won. He denied running across the street. He conceded that he had patronized Buckhalter's gas station "a few times" and recognized Buckhalter, but did not recognize James.

*Edgar Richmond*

He lives at 7450 South Euclid with his nephews, George Richmond and Harry Kendall. He knows Ronald Buckhalter and his father, and has worked at their gas station. People played dice at the station every weekend. He has played dice there several times and has seen Ronald Buckhalter in the games. He last saw Buckhalter in a game sometime in the middle of May 1975. On the night of June 13 or in the early morning of June 14, 1975, he made change for a $100 bill that Vittorio Smith gave him.

On cross-examination, he denied telling the Assistant State's Attorney, in the presence of defense counsel, that after he made change for the $100, he saw Vittorio Smith inside his house.

Both parties stipulated that on May 27, 1977, at a conversation at which the Assistant State's Attorneys and defense counsel in this case were present, Edgar Richmond told the Assistant State's Attorney that after he saw Smith at the outside dice game and changed a $100 bill for him, he saw Smith "back inside the house."

*For the State in rebuttal*

*Booker T. Briggs*

In the early morning hours of June 14, 1975, it was raining and he was driving an automobile east on 75th Street. A man ran in front of his car at high speed as he approached Euclid Avenue. Although he tried to hit his

brakes, he hit the man with his car. A second man also ran across the street, and went toward South Shore High School and through the park. He stopped his vehicle and got out to look at the man he hit. The man was lying in the street, and had some money in his hand. Someone who claimed to be the man's cousin started to take the money out of his hand, but a police officer came up, took the money, and put it into the man's pocket. He observed that the man's black cap was stuck under the fender of his car, near the license plates.

On cross-examination, he acknowledged that he did not see a gun anywhere around the man lying in the street. He stated that he brought the cap from the car to the police officer, but does not know what happened to it. He stated that he did not get a traffic ticket that night. He acknowledged that he heard a person who had been robbed say, in the presence of a police officer, that the man lying in the street was running from a robbery.

*For the Defense in surrebuttal*
    *Edgar Richmond*
    He acknowledged that in the conversation stipulated to he said that he saw Vittorio Smith return to the house after playing dice outside. When he stated that Smith did not go back to the house, he was confused.

OPINION
    Defendant contends that he was not proved guilty beyond a doubt. He first argues that doubt is raised by certain inconsistencies in the State's witnesses' testimony, particularly that testimony which referred to different amounts of money. As defendant points out, Ronald Buckhalter first put the day's gas station receipts at $325.43, later said that they were $322.43, and in both instances conflicted with William James' testimony that the receipts were $323.50. Defendant also suggests as significant that although $322 was the amount recovered from defendant and claimed by Buckhalter to have been taken from him, acceptance of James' testimony that he gave defendant $2 should have put the amount at $324. Defendant further emphasizes that the State failed to introduce the gun or money allegedly involved in the robbery, the cap which defendant allegedly wore, or the list of gas station receipts allegedly shown by Buckhalter to the police. He concludes that the failure to introduce this evidence, coupled with all the discrepancies he cites in the State's case, raise a sufficient doubt as to his guilt and require that his conviction be reversed.

■■ We disagree with defendant's arguments. Defendant does not challenge the well-established rule that the sufficiency, weight and credibility of the evidence adduced at trial is a matter for determination by the trier of fact, and that its determination will not be reversed unless

the evidence is so unsatisfactory or improbable as to create a reasonable doubt of defendant's guilt. (*People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904; *People v. Wankewycz* (1977), 47 Ill. App. 3d 633, 365 N.E.2d 50.) Additionally, our supreme court has repeatedly held that a positive identification by a single witness with ample opportunity to observe is sufficient to sustain a conviction. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.) In the instant case, both Ronald Buckhalter and William James positively identified defendant as the man who robbed them at gunpoint, and corroborated each other's testimony as to the circumstances surrounding the incident. Their identification of defendant was corroborated by Police Officer Armistead, who testified that Buckhalter and James identified defendant as their assailant as he lay in the street after being struck by a car. That accident occurred moments after the robbery and approximately one block away from the scene of the crime, a location from which defendant was admittedly fleeing. Additionally, the money that was illegally taken was found in his possession. As we noted above, defendant argues that certain inconsistencies regarding the money raise doubt as to his guilt. However, we noted in *People v. Lagios* (1964), 51 Ill. App. 2d 440, 443, 201 N.E.2d 245, 247, that:

> "The offense of robbery is the use of force and intimidation in the taking of property from the person or presence of another. [Citation.] The value of the property taken is immaterial and its precise identification is unnecessary if the character of the property is such that exact identification is difficult. *People v. Carpenter*, 315 Ill. 87, 145 N.E. 664. This is particularly true of money which, in most instances, cannot be positively identified unless it bears some peculiar mark or designation not common to all currency."

In the instant case, as in *Lagios*, the amounts of money found in defendant's possession closely corresponded with what was taken from the complaining witnesses. (51 Ill. App. 2d 440, 443, 201 N.E.2d 245, 247.) Indeed, all references to the amounts of money received on the day in question at the gas station, given by the victims to defendant, or recovered from defendant by the police, differ by no more than $3 out of a total of well over $300. In light of the positive and convincing evidence of guilt referred to above, we conclude that any inconsistencies pointed to by defendant are wholly minor in nature and are not sufficient to raise a reasonable doubt as to his guilt.

■ In reaching our conclusion we note, as set out above, defendant's argument concerning the State's failure to introduce certain items into evidence. Defendant does not contend that the State violated his constitutional right to discovery of all exculpatory evidence within the

State's possession or control. (See Ill. Rev. Stat. 1975, ch. 110A, par. 412(c); *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Defendant does point out, however, the trial court's statement that the failure to introduce the gun, money and other physical evidence "in effect is a destruction of the evidence." Defendant argues that the "destruction" or nonintroduction of the items in question casts sufficient doubt upon the State's case to require reversal of his conviction. We disagree. There is no support for the inference that the State or the police had the items in question in their possession, but purposefully withheld or "destroyed" them because they were favorable to defendant. Where, as here, there is no evidence that the State or the police were in possession of the items in question, defendant cannot urge reversal because those items were suppressed. (See *People v. Steptoe* (1976), 35 Ill. App. 3d 1075, 343 N.E.2d 1.) Moreover, as we concluded in *People v. Gaitor* (1977), 49 Ill. App. 3d 449, 454, 364 N.E.2d 484, 488, "when the evidence in question is considered within the context of the entire case it cannot be maintained that the failure to produce such evidence mandates reversal of defendant's conviction." In light of the strong evidence of guilt referred to above, we cannot agree, as defendant argues, that the failure to introduce the gun, currency, or other items connected with the robbery "deprived the trial court of the opportunity to accurately resolve a [the] issues in the case." In this case, as in *Gaitor* "[t]he trial court was fully aware of the State's failure to produce the evidence in question and defendant was in no way precluded from arguing to the trial court any inference which may be said to arise from this fact." (49 Ill. App. 3d 449, 455, 364 N.E.2d 484, 488.) In closing argument below, defense counsel did argue for certain inferences to be made against the State's case based on the nonproduction of the evidence in question. Additionally, the trial court's remarks indicate that it was wholly aware of the nonproduction. The trial court nevertheless concluded that in light of the strong evidence adduced, defendant was proved guilty beyond a reasonable doubt. We conclude that the record, which we have carefully reviewed, amply supports the trial court's determination, and that the State's failure to produce certain items of evidence does not unduly prejudice defendant or require that his conviction be reversed. Based on the foregoing, the judgment is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.