THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL SAKALAS *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 78-670, 78-1278 cons.

Opinion filed May 9, 1980.

James J. Doherty, Public Defender, of Chicago, for appellant Michael Sakalas.

Joseph S. Witkowski, of Chicago, for appellant Joseph Stravinskas.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Bruce W. Lester, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

In a simultaneous trial, defendant Sakalas was convicted by a jury of aggravated battery, and defendant Stravinskas was convicted by the court of both armed robbery and aggravated battery. Sakalas was given a five-year sentence and Stravinskas concurrent sentences of four to six years for armed robbery and two to six years for aggravated battery. On appeal, Sakalas contends that his warrantless arrest should have been quashed because probable cause was lacking and, alternatively, that it was illegal because it was made inside his home. Stravinskas separately asserts that he did not waive a jury trial and that he was not proved guilty beyond a reasonable doubt. Both defendants maintain that they were prejudiced by the State's failure to provide certain reports and photographs before trial.

Prior to trial, Stravinskas moved to quash his arrest and suppress his identification. He and the State stipulated, for the purposes of the pretrial hearing, that on October 6, 1974, police officer Antelek responded to a call

of an aggravated battery at 7300 South Kedzie, in Chicago, where Issac Clark (a black bus driver) said he had been attacked by two men on the bus. He described one as a white male, 25 to 30 years old, 5′6″ to 6′ tall, with a bandage on his neck, and the other as a white male, 25 to 30 years old, weighing approximately 175 pounds and wearing a cap.

At the pretrial hearing, Sakalas testified that police officers came to his home and asked him to come to the police station concerning a fight occurring a few days earlier. He went with them and, at the station, he was read his rights and placed in a lineup with friends of his who came to the police station after having been called by his mother. Officer Antelek testified that on October 13, he and his partner, Officer Botwinski, were told by Michael Leonard that he had heard Sakalas say that "he beat a nigger in the bus at 73rd and Kedzie" a few days earlier. Antelek stated that he obtained the address of Sakalas from Leonard, and he and his partner went to Sakalas' home where they identified themselves as police officers and asked him to come to the station because of his involvement in a fight occurring a few days earlier. Sakalas stated that he had not been involved in any fight, but accompanied the officers to the station where he was placed in a lineup and identified by Clark as an assailant. It is undisputed that the officers had no warrant for Sakalas' arrest.

The motion to quash and suppress was denied—with the court finding that the officers had probable cause to arrest.

At trial, Clark·testified that on the evening of October 6, he was the driver of a Chicago Transit Authority (CTA) bus, which was parked under a streetlight on 73rd Street near Kedzie; that the headlights and the interior dome lights of the bus were on; that he was wearing a CTA uniform with his badge pinned on his shirt-sleeve; that two white males (whom he later identified as defendants) walked across 73rd Street in front of the bus and both entered by the front side door; that Stravinskas said he was going to "f___ [him] up"; that Sakalas then told Stravinskas, "Go ahead, f___ the black son-of-bitch—go ahead, kill the black son-of-a-bitch"; that Stravinskas hit him [Clark] in the face with his fist, and both defendants then began striking him on the head and arm with pipes; that he noticed a white gauze patch on Stravinskas' neck; that at the conclusion of the beating, Sakalas said, "Man, let's go"; and that Sakalas grabbed the CTA badge from his shirt-sleeve on the way out. Later that day, Clark viewed a lineup at the police station and identified Stravinskas as one of his assailants. On cross-examination, Clark stated that he did not observe whether his assailants had mustaches or scars, and that at the lineup Stravinskas was the only person wearing a blue jacket as well as the only person having his jacket zipped to the top with his collar pulled up.

Dr. George Siler, CTA medical director, testified that he had examined and treated Clark on approximately 14 occasions beginning

October 7, 1974, and that Clark suffered lacerations on his forehead and left side of his face in addition to having a broken left arm.

Defendants rested without presenting any evidence, and they were convicted and sentenced as stated above, with this appeal following.

OPINION

Sakalas initially asserts that his warrantless arrest should have been quashed because probable cause was lacking. We first note that the determination of whether probable cause for an arrest exists in a specific instance depends upon the totality of the facts and circumstances known to the officers when an arrest is made (*People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228; *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356), and probable cause exists if a reasonable and prudent person in possession of the knowledge which has come to the arresting officer would believe that the person to be arrested had committed a crime (*People v. Vogel* (1978), 58 Ill. App. 3d 910, 374 N.E.2d 1152). Hearsay evidence may be considered in the determination of probable cause (*People v. Brooks* (1973), 13 Ill. App. 3d 1003, 301 N.E.2d 496), and the court's finding will not be disturbed unless manifestly erroneous (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280).

■■ *Clay* involved a warrantless arrest for the armed robberies and murder occurring in a tavern. Witnesses informed police that the two men involved had shotguns and were black males in their early twenties, approximately 5'8" and 6' tall, with one being dark and the other light complected. Three days later, police officers questioned an individual named Charles Knox, who told them that two days before he met a man known to him as Moses, who was with another man identified by Moses as his brother; that Moses said that he and his brother had committed a robbery on Bissell Street and that he had "to trigger the woman with a shotgun"; that Moses was approximately 20 years old and was dark complected, and his brother was light complected; that he had seen a shotgun in the front bedroom of Moses' apartment; and that while he did not know Moses' specific address, he could point out the building and describe the floor plan of Moses' apartment. The police then went to the building, entered the apartment, and arrested Moses and his two brothers. In concluding there was probable cause, the court reasoned:

> "To establish probable cause for the defendant's arrest under the circumstances in this case it was not necessary that it be established that Knox was an informant who had previously given reliable information to the police. This is not the customary case where the arrest is made solely on the basis of information obtained from an informant. The officers knew that a murder and three armed robberies had been committed by two men armed with shotguns.

They knew the descriptions of the men. What Knox told the officers was corroborated by the descriptions of the men as to age, height and complexion which they had received from witnesses. This independent corroboration of the information obtained from Knox was sufficient to establish probable cause to arrest the defendants. (Citations.)" 55 Ill. 2d 501, 505, 304 N.E.2d 280, 282.

The situation here parallels the circumstances presented in *Clay*. Officer Antelek had information that a black bus driver had been beaten by two white men in his bus at 73rd and Kedzie on October 6. In addition, the bus driver told Antelek that one of his assailants was 25 to 30 years old, 5'6" to 6' tall, with a bandage on his neck; that the other was 25 to 30 years old, wore a cap, and weighed approximately 175 pounds; and that one was light and the other dark complected. One week after the beating, Antelek was told by Leonard that he overheard Michael Sakalas say that a few days earlier he "beat a nigger in a bus at 73rd and Kedzie." Thus, Leonard gave information which corroborated facts already known to Antelek—that is, the beating of a black man in a bus a few days earlier at 73rd and Kedzie. Additionally, when Officer Antelek went to Sakalas' home and spoke with him, Leonard's information was further corroborated in that Sakalas fit the general description Clark had given of one of the assailants. In view thereof, we believe that the trial court's finding of probable cause to arrest was not manifestly erroneous.

Alternatively, Sakalas argues that even though probable cause existed, the warrantless arrest made at his home was illegal in the absence of exigent circumstances excusing a warrant.

In this regard, we note that in *People v. Johnson* (1970), 45 Ill. 2d 283, 259 N.E.2d 57, *cert. denied* (1972), 407 U.S. 914, 32 L. Ed. 2d 689, 92 S. Ct. 2445, the Illinois Supreme Court held that where probable cause existed, the police had a right to enter a home to make an arrest without a warrant or consent. This holding has been the controlling law in this State (see *Clay*; *People v. Taylor* (1979), 68 Ill. App. 3d 776, 386 N.E.2d 555) and, in view thereof, the question of the necessity of a showing of exigent circumstances to excuse a warrant was very seldom considered by the reviewing courts in Illinois (see *People v. Logan* (1979), 78 Ill. App. 3d 646, 397 N.E.2d 504; *People v. Bean* (1979), 73 Ill. App. 3d 918, 392 N.E.2d 650; *People v. Abney* (1978), 58 Ill. App. 3d 54, 373 N.E.2d 861).[1]

In *United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820, the United States Supreme Court held that where probable cause exists, a warrantless arrest may be made in a public place (a restaurant) without exigent circumstances. However, in *Watson*, the court specifically stated that it left unsettled the question of whether and under

---

[1] *Bean* and *Abney* are presently pending in the Illinois Supreme Court.

what circumstances an officer may enter a citizen's home to arrest that citizen. Recently, however, that court held in *Payton v. New York* (April 15, 1980), 48 U.S. L.W. 4375, that, in the absence of exigent circumstances, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment. The arrest in the instant case was without warrant, and we are thus concerned with questions as to whether it was with consent and, if not, whether exigent circumstances existed.

■■ On a motion to quash an arrest, the burden of proof is upon the defendant (*In re Potts* (1978), 58 Ill. App. 3d 550, 374 N.E.2d 891; *People v. Thomas* (1977), 47 Ill. App. 3d 402, 362 N.E.2d 7) and thus, defendant here was required to establish the warrantless entry to be nonconsensual. The record discloses that this was not done. Concerning the entry of the police, Sakalas testified at the hearing on the motion to quash only that they "came to my home" and that "my mother and stepfather" were also home. Officer Antelek was the only other witness testifying at the hearing, and he merely stated that after talking to Leonard, he arrested Sakalas but he did not say (nor was he asked) where or under what circumstances the arrest was made.

Additionally, in considering a ruling upon a motion to suppress, a reviewing court may consider evidence during trial after the conclusion of the suppression hearing. (*People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Turner* (1976), 35 Ill. App. 3d 550, 342 N.E.2d 158.) Here, the only testimony during trial as to entry came from Officer Botwinski, who stated that he and Antelek went to Sakalas' home, where they had a conversation with him, and he then came to the police station in his own car and was then given his "rights" and asked to stand in the lineup. Thus, it appears from Botwinski's testimony that the arrest may not have occurred until Sakalas came to the station. In any event, there is no testimony from any witness, either at the hearing or subsequently at trial, that the officers physically entered the home. Sakalas said only that the police came to his home and asked him to come to the station. Antelek said that he and Botwinski went to Sakalas' home, had a conversation with him, and asked that he come to the station. In the light of the foregoing, we conclude that defendant did not establish a nonconsensual police entry.

Moreover, even if the police entry was without consent, we believe that exigent circumstances existed.

"The following have been enumerated as factors to be considered in determining whether exigent circumstances exist:

'(1) the gravity or violent nature of the offense with which the suspect is ·to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of

probable cause * * * to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.' *United States v. Reed* (2d Cir. 1978), 572 F.2d 412, 424, citing *Dorman v. United States* (D. C. Cir. 1970), 435 F.2d 385, 392-93."

(*Taylor*, 68 Ill. App. 3d 776, 779, 386 N.E.2d 555, 557-58.)

It appears that all of the factors set forth above need not be present for exigent circumstances to exist (*Logan*); rather, it is clear that those factors need only be satisfied "on balance." *Bean*, 73 Ill. App. 3d 918, 926, 392 N.E.2d 650, 655.

■■ Here, the information which formed the basis for Sakalas' arrest was of high quality in that the police officers had obtained details of the occurrence with a description of the defendants, as well as information from Leonard linking Sakalas to the crime. The offenses charged— aggravated battery and armed battery—were violent crimes and, although the officers had no reason to believe that Sakalas was armed, they were aware that they were seeking a person who had used a pipe in a violent beating of another individual. Furthermore, there is nothing in the record to indicate that the officers physically entered Sakalas' home; but, even if they did, it was during daytime—without force and under a reasonable belief that Sakalas was on the premises. While there is nothing in the record to indicate a likelihood that Sakalas would escape, we believe that the factors set forth above were established and that exigent circumstances existed to justify the warrantless entry.

We turn then to the contention of Stravinskas, that he did not knowingly waive a jury trial. In this regard, we initially note a number of indications to the contrary. First, prior to the commencement of trial, the following colloquy took place:

"MR. CAHILL: State is ready today, Your Honor, to begin trial.

THE COURT: Okay.

MR. WITKOWSKI [Stravinskas's attorney]: Judge there is a possibility that may be bench, but can I have a few minutes with my client to—

THE COURT: Certainly. I'll need a jury anyway.

MR. SMITH [Sakalas's attorney]: Yes.

MR. WITKOWSKI: If there would be a bench and a jury, Your Honor, could we have a short conference and find out what the ground rules would be, if we are going to try them together.

THE COURT: Sure." .

Second, during a subsequent conference, in a discussion concerning an objection to testimony that the State indicated it was going to

introduce, counsel for Stravinskas stated, "I don't see any relevance from the beginning, but you know, if you are going to argue this time *since my case is a bench trial,* I thought when he presented it we would argue." (Emphasis added.) Third, during voir dire, in the presence of Stravinskas and his attorney, the court told the potential jurors:

> "I pointed out there are two defendants in this case. You are to consider only the matter of Michael Sakalas. That's the only individual whose guilt or innocence you will judge. Mr. Stravinskas' guilt or innocence will be judged by me."

Fourth, at trial, when the police officer who arrested Stravinskas gave testimony which concerned him and not Sakalas, the jury was excused. Finally, the common law record shows that Stravinskas opted for a bench trial the day the jury was selected and signed a jury waiver two days later.

■■ Whether there is a knowing and understanding waiver of a jury trial depends on the facts and circumstances of each case and, accordingly, there is no precise formula for determining whether such a waiver is understandingly made. (*People v. Richardson* (1965), 32 Ill. 2d 497, 207 N.E.2d 453; *People v. Webb* (1976), 38 Ill. App. 3d 629, 347 N.E.2d 486.) However, when a defendant permits his attorney in his presence and without objection to waive a jury trial, he is bound by that action (*People v. Sailor* (1969), 43 Ill. 2d 256, 253 N.E.2d 397; *People v. Melero* (1968), 99 Ill. App. 2d 208, 240 N.E.2d 756) and, while the common law record is presumptively correct (*People v. Gentry* (1977), 48 Ill. App. 3d 900, 363 N.E.2d 146; *People v. Feather* (1976), 42 Ill. App. 3d 974, 356 N.E.2d 885), the reviewing court must consider the record as a whole in making its determination (*People v. Murff* (1979), 69 Ill. App. 3d 560, 387 N.E.2d 920; *Feather*).

Here, there was a waiver of a jury trial, whether one looks at the common law record alone or views the record as a whole. The former clearly indicates that Stravinskas chose to be tried by the bench, and the report of proceedings reflects that before the trial commenced defense counsel stated that "my case is a bench trial"; that Stravinskas was present when, on two occasions, the court told the prospective jurors that his guilt or innocence would be determined by the court; that Stravinskas was also present when the jury was excused during testimony concerning him but not Sakalas; and that Stravinskas was aware that the jury was not present when his attorney presented his defense and made closing argument out of the presence of the jury.

Stravinskas also contends that his guilt was not proved beyond a reasonable doubt. He first argues that the evidence that his codefendant pulled off the victim's badge does not make him accountable for armed robbery. ·

■■ In this regard, we note that in order to establish legal accountability

for the acts of another, the State must prove beyond a reasonable doubt that (1) the accused solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) such participation took place either before or during the commission of the offense; and (3) it was with the concurrent specific intent to promote or facilitate the commission of the offense (*People v. Campbell* (1979), 77 Ill. App. 3d 804, 396 N.E.2d 607; *People v. Houston* (1979), 74 Ill. App. 3d 586, 393 N.E.2d 529), but mere presence at the scene of the crime and flight therefrom alone are not sufficient to establish guilt under an accountability theory (*People v. Carpenter* (1979), 74 Ill. App. 3d 770, 393 N.E.2d 50; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898).

It is Stravinskas' position that there is no evidence that he facilitated Sakalas' taking of the badge and, even if there was, there is no indication that such facilitation was with the intent that armed robbery be committed. The State argues that Stravinskas' presence at the scene of the armed robbery, without displaying disapproval in addition to his subsequent escape, "conclusively establishes that he aided and abetted this offense."

Clark testified that "during the period of beating, Mr. Sakalas said, 'Man, let's go.' So, on his way out he grabbed my badge and jerked it off my arm and left off the back door." His testimony, however, does not indicate that Stravinskas assisted or attempted to assist in the taking of the badge, nor does it reveal whether Stravinskas observed Sakalas jerk the badge off his arm or whether Stravinskas was still on the bus at that time. Clark said that his badge was taken as Sakalas was leaving the bus, and Stravinskas may already have left. In view thereof, we find that the evidence does not establish beyond a reasonable doubt that he had a concurrent, specific intent to promote or facilitate the commission of this offense, and we reverse the conviction of armed robbery.

■■ Stravinskas next argues that the identification testimony was so inadequate that it leaves a reasonable doubt as to guilt of aggravated battery. We disagree. In this regard, we note that the positive and credible testimony of a single occurrence witness is sufficient to support a conviction (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915), and that in a bench trial, the credibility of witnesses and the weight to be afforded their testimony is determined by the trial court, whose judgment will not be set aside unless the proof is so unsatisfactory as to create a reasonable doubt of guilt (*People v. Herron* (1979), 76 Ill. App. 3d 437, 395 N.E.2d 169; *People v. Klisnick* (1979), 73 Ill. App. 3d 148, 390 N.E.2d 1330).

Here, Clark testified that Stravinskas was one of the two men who beat him on October 6; that on that evening he was sitting in a bus parked under a streetlight and that both the interior lights and the headlights were

on; that his two assailants were in his view as they walked in front of the bus and entered the front side door of the vehicle; that Stravinskas and he exchanged words before the two defendants beat him up; and that he noticed a white gauze patch on Stravinskas' neck during the beating.

Nonetheless, Stravinskas urges that the victim's ability to observe his assailant was limited because it was indicated that the incident may have lasted for only one minute; that the victim put his hand in front of his face while he was protecting himself; and that the victim averted his attention alternatively to each offender to avoid being struck.

It is clear, however, that an identification can be positive even though the witness viewed the accused for a short period of time. (*Harrison*; *People v. Hahn* (1976), 39 Ill. App. 3d 969, 350 N.E.2d 839.) In *Harrison*, we held that a witness who looked directly at a robber for 30 seconds in a well-lighted store made a positive identification. In *Hahn*, an identification was held to be positive, although the officer had viewed defendant for only two seconds where he was only eight feet away in a well-lighted area. Here, the victim not only observed Stravinskas inside a well-lighted bus during the beating—which could have been anywhere from one to 10 minutes—he also saw him when he walked in front of the bus headlights and while this defendant talked to him inside the bus, before the beating started.

We see no merit in the additional argument that the victim's identification of Stravinskas was not positive, because (1) he could not determine whether his assailants had scars or mustaches; and (2) he originally informed the police that both were 25 to 30 years old at the time of the incident—when, in fact, Stravinskas was 19 years old.

> "The credibility of an identification does not rest upon the type of facial description or other physical features which the complaining witness is able to relate. (*People v. McCall*, 29 Ill. 2d 292, 295, 194 N.E.2d 222.) It depends rather upon whether the witness had a full and adequate opportunity to observe the defendant. (See *People v. Catlett*, 48 Ill. 2d 56, 63, 268 N.E.2d 378, and *People v. Brown*, 14 Ill. App. 3d 242, 245, 302 N.E.2d 161.) A mere discrepancy in description, or an omission to note facial or other physical features, is not by itself sufficient to create a reasonable doubt of guilt." (*People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 19-20, 337 N.E.2d 454, 460.)

Based upon the victim's observations (as noted above) before and during the beating in well-lighted surroundings, we believe that Clark's identification was positive and credible notwithstanding the discrepancies referred to by Stravinskas.

Stravinskas also contends that the pretrial lineup was unduly suggestive. It is well established that evidence of pretrial identification of

a defendant must be excluded at trial where both (1) the procedure used was unnecessarily suggestive; and (2) there is a substantial likelihood of misidentification (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377); that the burden rests upon the defendant to establish these two factors (*People v. Madden* (1977), 52 Ill. App. 3d 951, 368 N.E.2d 384; *Witherspoon*); and that the courts will look to the totality of the circumstances surrounding the pretrial confrontation to determine whether it is unnecessarily suggestive (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469).

■■ Here, Stravinskas argues that the lineup was unduly suggestive because he was put in a lineup with four policemen, but only he wore a blue jacket similar to the one worn by an assailant and he alone had his jacket zipped to the top with the collar pulled up. As stated in *People v. Madden* (1977), 52 Ill. App. 3d 951, 956, 368 N.E.2d 384, 389, where defendant was wearing a coat in a lineup which was similar to the one described by the witness, the court stated:

> "[I]n the absence of any evidence showing that Madden was required by the police to wear the coat, there can be no claim of impermissible suggestiveness such that the identifications should have been suppressed. (Citation.)"

■■ ■ In the instant case, there is nothing in the record indicating that Stravinskas was required to wear the blue jacket or that it was to be worn in any particular manner. Thus, we reject his contention that the lineup was unnecessarily suggestive. In any event, the existence of an independent origin will validate an in-court identification even though there may have been a previous identification which was impermissibly suggestive. (*People v. Connolly* (1973), 55 Ill. 2d 421, 303 N.E.2d 409; *Harrison.*) Here, Clark observed Stravinskas in the headlights of the bus, in the well-lighted interior of the bus before and during the beating, and he identified him within a few hours after the occurrence. In view thereof, we conclude that a sufficient independent origin existed.

Both defendants contend that they were denied a fair trial by the State's failure to disclose certain photographs before trial. The defense filed timely motions for discovery of favorable evidence, and defendants argue that the admission of a photograph[2] showing the victim's injuries was improper because they were not disclosed until the direct examination of the victim (Clark). After defense counsel had examined six photographs depicting the victim's injuries, the court allowed one to be admitted over defendant's objection.

---

[2] Defendant mentions two photographs, but the record discloses that only one was admitted.

We initially note that the State asserts that it amended its answer to discovery to include the photographs; however, as no such pleading appears in the record, we will consider it as not having been amended. (See *Continental Casualty Co. v. Aetna Insurance Co.* (1980), 82 Ill. App. 3d 402, 402 N.E.2d 756.) Concerning the question of admissibility, it is established that upon proper request, photographs should be produced where the State intends to use them at trial or they are favorable to the defense. (*People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592; *People v. Molsby* (1978), 66 Ill. App. 3d 647, 383 N.E.2d 1336; Ill. Rev. Stat. 1973, ch. 110A, pars. 412(a)(v), 412(c).) However, even in those instances where physical evidence was improperly admitted, a reviewing court will not reverse where it does not appear that surprise or prejudice resulted. *People v. Gott* (1976), 43 Ill. App. 3d 137, 356 N.E.2d 1102; *People v. Jones* (1973), 13 Ill. App. 3d 684, 301 N.E.2d 85.

■■ Here, the photograph should have been produced, since it appears clear that it was the intent of the State to use it inasmuch as it was offered during the direct examination of its first witness. However, neither defendant argues surprise or prejudice by reason of its admission, and we are unable to so determine because the record does not include the photograph in question. In view thereof, we find that its admission was harmless beyond a reasonable doubt.

Defendants do assert they were prejudiced because of the State's failure to provide them, before trial, with a CTA "lost badge report," the special occurrence report of Mr. Coleman of the CTA, and "numerous reports" possessed by Dr. George Siler of the CTA.

During the redirect examination of Clark, defendants objected to the State's reference to a CTA report concerning Clark's stolen badge on the ground that the report had not been produced. The State informed the court that it had received a change-of-badge receipt and the special occurrence report only five minutes before, and prior thereto had no knowledge of them. The special occurrence report included the following statement: "Operator stated that as he sat waiting for his leaving time, two white males walked from a nearby tavern and approached the bus as if they were passengers." The court permitted Stravinskas to reopen cross-examination of Clark to use the report for impeachment, and Clark denied that he saw or told anyone he had seen the two men walking from a tavern.

During the State's direct examination of Dr. George Siler, defense counsel objected to the "myriad of reports" in front of the witness on the ground that he had not seen them. The State's Attorney informed the court that he had not seen these reports until Dr. Siler brought them to court, and had no intention of using them. After defendants examined the reports, they moved for a mistrial on the ground that the State had

withheld information which could have been used to impeach Clark's testimony. The State informed the court that prior to trial, it had subpoenaed the records of the CTA; that all of the documents it received (which did not include Dr. Siler's reports) were then tendered to defendants; and that it had contacted Dr. Siler one week earlier and asked him to bring his reports concerning the treatment of Clark. The motion for mistrial was denied, but defendants were permitted to recall Clark for purposes of impeachment.

Defendants refer us to Supreme Court Rules 412(c) and 415(b). (Ill. Rev. Stat. 1973, ch. 110A, pars. 412(c), 415(b).) Rule 412(c) provides that "the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor." Rule 415(c) states that "[i]f * * * a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified." Defendants argue that these rules were violated by the State's failure to contact the defense when it became aware of the additional documents.

Considering first the change-of-badge receipt and the special occurrence report, we note that the State was aware of them but they were not produced until defendants objected for failure to disclose. Defendants do not assert that the change-of-badge receipt contains any information helpful to the defense. However, they do argue the special occurrence report includes impeaching information.

The trial court must exercise sound discretion as to the appropriate remedy to be invoked for the failure to disclose evidence during discovery, and this exercise of judicial discretion will not be reversed unless prejudice or surprise is demonstrated. *People v. Wilson* (1978), 61 Ill. App. 3d 401, 377 N.E.2d 1284; *People v. Curtis* (1977), 48 Ill. App. 3d 375, 362 N.E.2d 1319.

■■ ■ On oral argument, defendants take the position that they were prejudiced by nondisclosure of the special occurrence report, because it denied them the opportunity to conduct investigation concerning the victim's statement therein that his assailants came from a tavern. We reject this position—first, because defendants failed to raise this argument in their briefs and it is thus waived on review (Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7)); *Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 400 N.E.2d 27); and, second, because no prejudice resulted. Defendants stated on oral argument that they did not ask for and were not precluded from additional time for investigation when they learned of the report at trial, and the court permitted the

reopening of cross-examination to allow impeachment based on the report. As no prejudice is demonstrated, reversal is unwarranted on this ground.

As to defendants' argument that the State's nondisclosure of the reports of Dr. Siler was error, we note that he was the CTA medical officer, and there is nothing to indicate that the State had possession or control of material. Under such circumstances, the prosecution cannot be charged with suppressing it. *People v. Smith* (1977), 69 Ill. App. 3d 704, 388 N.E.2d 184.

■■ Here, it is indicated that the State, before trial, had tendered all the documents received from the CTA pursuant to a subpoena requesting all reports concerning the beating of its bus driver. Although the State had contact with Dr. Siler one week prior to trial and asked him to bring to court his reports concerning treatment of Clark, it does not appear that the State was aware of the contents of those documents or had reason to believe that they contained any information favorable to the defendants. In the absence of a showing that the State or its agents had such possession or knowledge of this material, we see no error and, in any event, we believe that the trial court remedied any possible error by permitting the recall of Clark under cross-examination to allow impeachment based on the reports. Defendants do not argue that they were otherwise prejudiced by failure to see the reports before trial.

■■ Defendants finally argue that there is no rational basis for distinguishing between police reports which must be disclosed to defendants and reports prepared by employees of the CTA. However, we note that there is specific authority for such differentiation. Supreme Court Rule 412 (Ill. Rev. Stat. 1973, ch. 110A, par. 412) provides, in pertinent part:

"(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevent to the accused and the offense charged.

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State and which is in the possession or control of other governmental personnel, the State shall use diligent good faith efforts to cause such material to be made available to defense counsel; and if the State's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel."

The commentary accompanying the rule provides, in part:

"Paragraph (f) is designed to deal with the problem of the extent

to which the State can be expected to know of the existence of material or information which it is obligated to disclose. In discharging its duties it should know, or seek to know, of the existence of material or information at least equal to that which it should disclose to defense counsel. The formulation of a Rule such as this means especially that the State should not discourage the flow of information to it from investigative personnel in order to avoid having to make disclosure." (Ill. Ann. Stat., ch. 110A, par. 412, Committee Comments, at 681 (Smith-Hurd 1976).)

In view thereof, it is clear that while the State is expected to know of the existence of material in the possession of the police department, as it is an investigative body, there is no expectation that the State know of information possessed by a noninvestigative governmental body such as the CTA.

Accordingly, the convictions of defendants Sakalas and Stravinskas for aggravated battery are affirmed. The conviction of defendant Stravinskas for armed robbery is reversed.

Affirmed in part.

Reversed in part.

MEJDA and WILSON, JJ., concur.