THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KIP O'SHAUGHNESSY, Defendant-Appellant.

First District (4th Division)    No. 79-873

Opinion filed December 23, 1981.

David C. Thomas, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Christine A. Campbell, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:
Defendant Kip O'Shaughnessy was charged by indictment with armed robbery and aggravated kidnapping. A jury acquitted him on the charge of aggravated kidnapping but returned a guilty verdict on the charge of armed robbery. Defendant was subsequently sentenced to an indeterminate term of four years to four years and one day.

On appeal defendant contends: (1) the State failed to establish beyond a reasonable doubt that he had the specific intent to permanently deprive the victim of the use or benefit of his property; (2) the trial court erred in permitting a State instruction which informed the jury that witnesses who are narcotics addicts become notorious liars; (3) the trial court erred in allowing a State instruction on the defense of drugged condition which restated in different language an instruction which had already been given and which incorrectly stated the law; (4) the trial court abused its discretion by allowing the State to introduce evidence of defendant's prior robbery conviction. We affirm.

At trial the following pertinent evidence was adduced. On May 15, 1975, at approximately 3 a.m. Dennis Tolen was driving southbound on Cicero Avenue in Cicero, servicing stops on his work route. He noticed that a car began following him at 18th Street and continued to follow him when he turned left at 31st Street. When Tolen stopped at a red light the other car stopped behind him, its lights were extinguished, and a man identified by Tolen in court as the defendant got out of the car. Defendant walked up to Tolen's van, opened the door, and announced a robbery. He had a knife in his hand, and as he entered the van he told Tolen not to do anything foolish. According to Tolen defendant also had a pistol in his belt. Defendant directed Tolen to drive the van in circles in the area. Tolen drove in this manner for about half an hour. During this period defendant asked Tolen for money and received from him about $150, which he placed in his pocket. He also took a calculator from the van and a number of credit cards from Tolen's wallet, which he returned

after taking the cards. According to Tolen defendant had the knife out during the entire incident. For 15 or 20 minutes after having taken Tolen's property, defendant kept insisting that there was more money in the van as well as a safe. He rummaged around the front of the van, at one point eating a sweet roll he found and declaring it to taste "lousy." Finally when Tolen stopped for a stop sign defendant told him to keep heading south, not to do anything foolish, and then jumped off the van.

Tolan drove several blocks until he saw a police car, which he stopped. He informed the police officers of the robbery, describing defendant and his vehicle to them. Tolen then accompanied the officers in their car in search of the defendant. He observed defendant's car, which was then traveling within the speed limit. The police car pulled behind it, signalling for it to stop. Defendant's car sped away, and a high speed chase ensued. At one point defendant's car weaved in between two trucks. Finally defendant made a right turn and then a sharp left turn into an alley. When the police car arrived Tolen saw the defendant walking about 30 feet away from his car.

The two police officers who accompanied Tolen testified that defendant was then told to stop but instead ran through a gangway. He was chased until he climbed the 12-foot fence of a car dealership and hid under one of the cars. One of the officers told him to come out and climb back over the fence and he did so. Four credit cards and $160 in cash were found on his person. Defendant stated that he did not know where the cards came from, but that he had won the money shooting dice. A hunting knife and four credit cards were found in his car. One of the officers also recovered a calculator in the gangway, where they had seen something fall from his pocket during the chase. One officer did not believe defendant to be intoxicated, but the other testified that when he observed defendant at the police station he appeared slightly intoxicated; his eyes were bloodshot and his speech was slightly slurred.

Testifying in his own behalf, defendant stated that he was 24 years old at the time of trial. He was working as a driver for a trucking company. Before taking that job he had driven a garbage truck for a scavenger company for one year. He left that job because his work interfered with his church obligations. In June 1974 defendant had pleaded guilty to a charge of robbery. In November 1974 he was released to a work-release center. He stayed there until March 1975, when he found work and was paroled.

Defendant testified that because of tensions at home he then left his wife and child and stopped working. He began to socialize with friends he had known from before his incarceration. By April 1975 he was regularly drinking and taking drugs; he used his savings to buy drugs daily. Defendant testified that he used "downers," acid (LSD), marijuana, and

THC. The quantities of THC he used increased until May 14, 1975, the day before the occurrence. That day he "snorted" THC in the morning and could not recall his activities of the day. At about 9 p.m. he went to a party where he drank some beer and took about one-fifth to one-sixth of a gram of THC. This was the largest dose he had ever taken. He also smoked some marijuana sprinkled with THC and took two tuinals (a depressant).

Defendant testified that as a result of these drugs he found it very difficult to converse, he was groggy, could not move fast, and could not see well. The next thing he remembered was being at his apartment where he went to bed but could not sleep. He then recalled driving south down Kostner (although Tolen had recalled the street as Cicero). At 28th Street he saw a van driving in front of him. The van turned east on 31st Street and he followed it. At a stoplight at 31st and Pulaski he got out of his car, walked to the van, knocked on the door, and opened it. He asked the driver for directions. The driver asked him to let him cross the intersection with the green light, so defendant stepped in the van. Defendant testified that he had a hunting knife in his hand at some point during the occurrence but could not recall if it was in his hand when he first approached the van. As the driver stopped on the other side of the intersection defendant announced a robbery and asked the driver for money. He also recalled asking for a wallet and seeing some credit cards in it. He may have seen a calculator in the van but did not recall later dropping it. Defendant was given some money by the driver; he then gave the man directions on where to drive. He testified on direct examination that he did not know what his intentions were and that he did not intend to take the driver away or to hide or conceal him. However on cross-examination defendant testified that he "assumed" he intended to take money from the driver when he announced the robbery. He also testified that when he asked the driver for money he "guessed" he intended to take the money from him and when he asked for the wallet he "assumed" he intended to take anything that was in the wallet.

Defendant went back to his car and began driving. When he saw the police he fled, but did not recall driving between two trucks. He stopped the car and ran. He then recalled being in a fenced-in area where he went under a car. The police told him to come out from under the car and climb back over the fence, which he did. He did not recall the officers taking credit cards from him nor could he recall what he did with the knife. The police had taken money from his pocket and at the station he saw the knife, credit cards, and a calculator. He recalled telling the police his name, describing his car, and giving them his license number. He was able to talk and to walk although he did not recall walking into the police station or the lock-up. He did remember climbing at least one fence while

being chased by the police. At the station defendant attempted not to act "high" because this would get him into more trouble.

Later that day defendant saw his wife at the station. At this time he felt confused and did not fully understand why he was there. He knew he had been in the victim's van but did not connect this with his incarceration.

Defendant further testified that he was released from jail in September 1975 and had worked as a painter and painter's helper. After leaving jail he lived with his child, wife, and wife's parents. He had never again used drugs and no longer drank.

Defendant's wife testified that in April 1975 she had seen defendant with his eyes glazed and blurred and his speech slurred. He was argumentative and belligerent. Earlier she had seen him smoking marijuana and taking tuinals and "speed." On prior occasions she had seen him taking THC and smoking marijuana and the result was to make him jumpy, argumentative, and so fast-talking she could not make full sense of his words. On other occasions after April 1975 she saw him under the influence of drugs again. He would drive his car recklessly, weaving in and out of traffic, speeding, and would be argumentative and loud.

On May 15, 1975, she saw her husband in the police lock-up at about 5:30 p.m. He told her he was accused of a crime but did not know what the police were talking about. He could not remember why he was there.

Defendant's wife confirmed that at the time of trial he was supporting his family by working as a truck driver. Before that he had worked for a year as a garbage-truck driver.

John Navarro testified that he attended the same party as defendant. The defendant drank beer, smoked marijuana, and "snorted" what Navarro believed to be "angel dust," which he also knew as THC. Defendant also took some pills which Navarro thought were "downers." Defendant appeared to be intoxicated, he staggered when he walked, he did not seem aware of what was going on, and mainly stayed by himself in a corner of the room. On cross-examination Navarro admitted that he too used marijuana and THC that night. He had taken those drugs before the party as well. Since the time of the party he had used them "maybe once or twice."

Dr. David Spira, a physician and psychiatrist who served as a consultant to a medical center for heroin addicts, testified that as a result of his training and work experience he was familiar with the behavioral effects of legitimate drugs prescribed by physicians and "street drugs," drugs procured illegally. He testified that the medical term THC refers to tetrahydrocanabinol, the active ingredient in marijuana. However the street drug purporting to be THC was rarely tetrahydrocanabinol, but instead was Phencyclidine, or angel dust. He also testified that often up to

50% of so-called THC was actually angel dust. The effect of angel dust on the person, according to Spira, is dependent on the personality of the person and the quantity ingested. The quantity also depended on the purity of the drug sold. If a significant dose, 5/1000 to 10/1000 of a gram of pure angel dust, is ingested a person's personality has the potential to intensify. A person could become more agitated or more seclusive. A person's judgment could become affected; he could experience hallucinations, amnesia, agitation, anxiety, and disorientation. However it is impossible to ascertain with certainty what effect the drug will have on any one person.

Dr. Spira heard a hypothetical statement of facts based on defendant's testimony of his drug intake, state of mind, and behavior. Spira testified that if the drug was angel dust, the person in the hypothetical statement acted in a manner consistent with the effects the drug could cause.

Defendant also presented a number of character witnesses. Reverend George Ozdinec testified that he had known defendant over two years. Defendant had joined Ozdinec's church with his wife. Defendant had the reputation of being a person who behaved and was truthful. Three members of the church congregation also testified that defendant had a reputation for truthfulness and honesty in the community.

I

At the time of trial the law in Illinois was that the specific intent to permanently deprive a person of his property was an element of the crimes of robbery and armed robbery. (*People v. White* (1977), 67 Ill. 2d 107, 365 N.E.2d 337, *overruled by People v. Banks* (1979), 75 Ill. 2d 383, 388 N.E.2d 1244.) The jury in this cause was so instructed. The sole defense presented by defendant was that his voluntary drugged condition at the time of the occurrence was such as to negative that specific intent. (Ill. Rev. Stat. 1979, ch. 38, par. 6—3(a).) On appeal defendant contends that the evidence he presented was sufficient to raise the defense and the State then failed to meet its burden of overcoming it with proof beyond a reasonable doubt. Ill. Rev. Stat. 1979, ch. 38, par. 3—2; *People v. Jones* (1978), 67 Ill. App. 3d 477, 384 N.E.2d 523.

■■ We find no merit to this contention. In order to constitute a defense to a criminal charge the condition of being intoxicated or in a drugged condition must be so great as to suspend all reason, thus rendering the defendant incapable of any mental act such as forming the specific intent to commit the crime. (*People v. Jones* (1978), 67 Ill. App. 3d 477, 384 N.E.2d 523; *People v. Hayes* (1976), 37 Ill. App. 3d 772, 347 N.E.2d 327.) But in this cause the defendant by his own testimony negated the defense. He testified that when he announced the robbery and asked for the

victim's money and wallet he intended to take that money and the contents of the wallet. Thus by his own admission at trial he had possessed the requisite specific intent despite his drugged condition.

## II

■■ Defendant also contends that the trial court erred when it instructed the jury that:

> "The testimony of a person who is a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars."

We agree with defendant that this was error. The instruction was not based on evidence adduced at trial and thus should not have been given. (*People v. Mitchell* (1975), 34 Ill. App. 3d 311, 340 N.E.2d 226.) There was no evidence that defendant or John Navarro, the only two witnesses to whom the instruction could have been construed to apply, were narcotics addicts at the time of trial. No evidence was presented that defendant used any drugs after the date of the occurrence and Navarro testified only that since that time he himself might have used marijuana or THC "once or twice." Furthermore, to the extent that the instruction could be construed as referring to the defendant, it gave undue emphasis to the issue of his credibility and on that additional ground should not have been given. (*People v. Smith* (1979), 69 Ill. App. 3d 704, 387 N.E.2d 901.) Because of these findings we do not reach the question of whether such an instruction would ever be proper. But despite our finding that the instruction was erroneously given, we do not find that defendant was prejudiced by it. As we have noted, defendant not only admitted committing the physical acts establishing armed robbery, his own testimony also established that he possessed the requisite intent when he committed them. The evidence of his guilt was overwhelming and the omission of the instruction would not have affected the jury's verdict; accordingly we will not reverse defendant's conviction because of that error. *People v. Tribbett* (1968), 41 Ill. 2d 267, 242 N.E.2d 249; *People v. Blackman* (1976), 44 Ill. App. 3d 137, 358 N.E.2d 50.

## III

■■■ The jury was also instructed that:

> "A drugged person is criminally responsible for his conduct unless his drugged condition renders him incapable of acting intentionally."

Additionally, over defense objection, they were instructed that:

> "Intoxication or drugged condition is a defense only if it negatives the existence of the mental state which is the element of the offense."

Defendant contends that it was error to offer this repetition of the prior instruction. But although repetitive instructions are not favored and should be avoided (*People v. Griswold* (1968), 100 Ill. App. 2d 436, 241 N.E.2d 212), we find no basis for reversal on this ground alone. Nor do we agree with defendant's contention that the second instruction improperly shifted the burden of proof on that issue to him. The instruction was drawn directly from the applicable statute. (Ill. Rev. Stat. 1979, ch. 38, par. 6—3(a).) Moreover the jury instruction on armed robbery informed the jury that the State had the burden of proving that defendant was capable of acting intentionally at the time of the occurrence. Thus, taken as a whole, the instructions to the jury did not tend to mislead them as to the burden of proof and we find no prejudice arising from the giving of the second instruction on the defense.

IV

Finally defendant contends that the trial court abused its discretion by allowing the State to introduce evidence of his prior conviction for robbery. Prior to trial defendant made a motion *in limine* to exclude evidence of the conviction. At the hearing on the motion the defendant was permitted to introduce the transcript of testimony heard before another judge on his bond hearing. This testimony was elicited from defendant's wife, his parole officer, a social worker, and two members of his church congregation. Their testimony indicated that defendant had previously been convicted of robbery and had served nine months in the penitentiary. He was released in February 1975 but was arrested again May 15 of that year on the charges at issue in this cause. During that period defendant was using drugs and alcohol. He was released on bond in September 1975. At that time he became associated with the Bethany Tabernacle Church, where he attended church functions every day of the week. He found work and used the income to support his wife and child, with whom he again began to live.

At the hearing on defendant's motion the trial judge was also informed that defendant had not been arrested since the bond hearing and was currently employed. The court denied defendant's motion but noted that defendant would be permitted to examine all the witnesses he wished at trial to rehabilitate himself after any State impeachment. Immediately before defendant testified at trial the motion was renewed and was again denied by the court.

■■ As our summary of the trial evidence establishes, defendant was permitted at trial to introduce substantial evidence of rehabilitation. The jury was informed that he no longer drank or used drugs, he was working steadily, supported his family, and had a good reputation for truth and honesty in his community. Defendant cites only two instances in which

the court restricted this testimony: he was not permitted to testify how he obtained his employment and was not permitted to state whether he still associated with the people with whom he had associated before being arrested. In the context of all the evidence that he was permitted to present concerning his rehabilitation we do not find these limitations significant.

■■■ The trial judge is afforded considerable discretion in determining whether evidence of a prior conviction which may be introduced should in fact be allowed into evidence. (*People v. Evans* (1981), 92 Ill. App. 3d 874, 416 N.E.2d 377; see *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Here the defendant had been released from custody within four years of trial, a period well within the 10-year limitation on such evidence. Although the prior conviction was for a similar crime, the prejudicial effect of this fact was minimized by the fact that defendant did not deny committing the acts alleged in the charge of armed robbery at issue. Moreover the trial judge afforded defendant broad latitude in introducing evidence at trial concerning his claimed rehabilitation. Accordingly, we do not find that the trial court abused its discretion in denying defendant's motion.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.